The judgment of the court was pronounced by
Slidell, J.
The plaintiffs, who are manufacturers in Birmingham, England, claim from the defendants, merchants in New Orleans, the balance due on a sale of hardware in 1836, under the following circumstances. On the 11th June, 1836, the defendants addressed to the plaintiffs the following letter: “New Orleans, June 11th, 1836. Messrs. Van Wart, SonSf Co., Birmingham: Dear sirs : Annexed we have the pleasure to hand you an order for sundries in your line, and of which you will please put at your lowest prices; please be particular to have them all put up in good strong casks, and forwarded to the care of Messrs. Jno. Hobson Sf Sons, Liverpool, on whom you can draw at six months, adding interest after your usual credit; the other houses to whom we gave orders have an agreement to extend the time, and presume you will have no objection to do the same. We wish one half of the order shipped about the 15th August, and the remainder in two months afterwards, but not later. Requesting your attention as above, yours respectfully, H. & W. Hopkins.
The plaintiffs sent the goods mentioned in the order to Jonathan Hobson Sf Sons, of Liverpool, who forwarded them to the defendants. Upon receipt of the goods the defendants gave to S. Sf T. Hobson Sf Co., the New Orleans branch of the house of Jonathan Hobson Sf Sons, their notes for the cost and charges of the goods, which were duly paid. The plaintiffs drew two bills of exchange on Jonathan Hobson Sf Sons, at Liverpool, which were accepted, under instructions from their New Orleans house: one for <£359 5s. 7d., dated November 1st, 1836, at six months after date; and one for ¿6273 6s. 9d., dated January, 18th, 1837, also payable at six months after date. Of the first bill ¿6143 17s. 7d. was drawn on account of the goods shipped to J. Hobson Sf Sons, for the Messrs. Hopkins, and the remainder of the amount was for goods shipped by J. Hobson 4" Sons for another New Orleans house. Of the second bill a part also (¿6120 7s. 4d.) was for the goods sold ,to the defendants, and the residue for goods sold to another house. When these bills matured J. Hobson Sf Co. had stopped payment. On the 28th April, 1837, the plaintiffs addressed a letter to the defendants, who appear to have made no reply. They informed the Messrs. Hopkins, that J. Hobson Sf Co. had failed, and that they held two drafts drawn for account of the Messrs. Hopkins: “one drawn 1st November, 1836, for ¿6143 17s. 7d., due the 4th May; and the other, dated 18th January, 1837, for £120 7s. 4d., due 21st July next; for which we of course hold you responsible.” They stated that there was reason to believe J. Hobson Sf Co. would in time pay all claims in full, and have a handsome surplus; but that a long time would probably be occupied in winding up their affairs, and that if convenient to the Messrs. Hopkins, a remittance of part of the amount of the bills would be acceptable. “They, Messrs. Hobson Sf Co., ’’says the letter, “are to collect the debts due and settle all claims, under the advice of some three or four of their Liverpool creditors ; and they propose to pay five shillings in the pound upon all their acceptances as they fall due, and to pay another instalment as soon as they have collected funds enough for that purpose.” In September, 1839, the plaintiff again wrote to the defendants, stating that they had received from J. Hobson Sf Sons three instalments of five shillings in the pound each, and requesting them to remit the balance. They describe the bills in the same way as in their previous letter, and say, “we must ask you to remit promptly, and we will, if *268 you should wish it, hand over the disbursed bills to any person you may appoint to receive them ; or we will hold them for your account, and claim for you any further dividend which Messrs. Hobson Sons may pay to their bill holders” This request remaining unanswered, was reiterated in 1841, in which letter the dishonored acceptances are s.till spoken of as hold on your account. The defendants .then replied ,by a denial of any liability.
In none of the letters of the plaintiffs do they state the fact that the bills were not drawn exclusively for account of the defendants. Nor is any allusion made to the release of J. Hobson 8f Sons. That the plaintiffs have absolutely released .them, is proved; but the date of the deed of release does not appear.
It may be assumed as the general rule under the English law, that a vendor agreeing to draw upon the vendee’s banker or factor for the price of goods, would not thereby merely lose his recourse against the vendee in the event of the subsequent dishonor of the bill. But undoubtedly the intention of the parties, if it can be ascertained, must control their rights. Here it is shown by the testimony of S. T. Hobson, one of the firm of J. Hobson Sons, that the acceptances were given in payment of the goods. It is true that the witness might perhaps be supposed to have used this expression loosely, if his testimony stood alone. But it derives a very strong confirmation from the conduct of the plaintiffs. If they did not intend to look to J. Hobson Sf Sons only, at all events after acceptance, how .was it that they blended another sale with that to defendants ? If they intended to look to the defendants for their ultimate indemnity it would have been natural and proper to keep their transaction distinct. For in case of non-payment and recourse .to the defendants upon the original consideration, it would have been their duty to hand the bills over, to fhe defendants, that they might recover .upon them for the acceptors. But here .the other New Orleans purchaser, whose transaction was blended with that of the defendants, would have as good a right as they to the possession of the bill; and thus the plaintiffs put it out of their own power to give the defendants the usual recourse upon the acceptor, which he ought always to have in a convenient and unembarrassed form, if he is to pay the person who has taken the bill. It is proper to notice in this connection, that the plaintiffs seem to have felt the danger of their real position and diguised the true state of the case in their letter of April, 1837. They tell the Messrs. Hoplcins they hold drafts drawn for their account for ¿6143 17s. 7d., and ¿6120 7s. 4d., as though they had been drawn for the specific amount of the defendants’ order, when in point of fact no such drafts existed.
But if there be any doubt-upon this point of the cause, there is another which is conclusive against the plaintiffs. This was not the case of a bankruptcy, as erroneously suggested by the plaintiff’s counsel, but a voluntary arrangement made between J. Hobson Sf Sons and their creditors, by which their assets were to be applied by themselves, under the supervision of certain persons selected, to the payment of their liabilities. What the particular' terms of the inspection .deed were we are not informed. B.ut whether it stipulated a future release or not, the plaintiffs in-their letters were silent on that point; they held out to the defendants the expectation that the drafts would be paid in full, and gave no intimation that they intended lo discharge the acceptors. It now appears, that without any assent or knowledge on the part of the defendants, the plaintiffs have given J. Hobsons § Sons an absolute release. In doing so, they have lost their recourse upon the defendants, if any they had. See Camidge v. Allenby, 6 Barn. and Creswell, 373.
Judgment affirmed, with costs.